IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANGELA NURSE, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 17-1117-RGA |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | : |
| Defendant. | : |

## MEMORANDUM OPINION

Angela Nurse, Bear, Delaware; Pro Se Plaintiff.

Eric P. Kressman, Regional Counsel, Region III, and Annie Kernicky, Assistant Deputy Regional Counsel, Office of the Regional Chief, Social Security Administration, Philadelphia, Pennsylvania; David C. Weiss, United States Attorney for the District of Delaware, Wilmington, Delaware; Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

February **__**, 2019
Wilmington, Delaware


ANDREWS, U.S. District Judge:

Plaintiff, Angela Nurse, who appears *pro se*, appeals the decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Jurisdiction exists pursuant to 42 U.S.C. § 405(g). Pending before the Court are cross motions for summary judgment filed by Nurse and the Commissioner. (D.I. 12, 13). Briefing is complete.

I. BACKGROUND

A. Procedural History

Nurse protectively filed for disability insurance benefits on December 12, 2013, alleging disability as of June 1, 2010 due to Graves' disease, depression, and leg problems. (D.I. 9-6 at 1-14). She amended her alleged disability onset date to February 25, 2013. (D.I. 9-3 at 4). After her application was denied on April 14, 2014, Nurse requested a hearing before an administrative law judge. (D.I. 9-4 at 2-24; D.I. 9-5 at 13). The administrative hearing was held on January 7, 2016, and Nurse appeared, represented by counsel. (D.I. 9-3 at 2-34). Testimony was provided by Nurse and vocational expert Antonia Chula. The ALJ issued an amended decision on March 28, 2016, finding that Nurse was not disabled because she was able to return to her past relevant work. (D.I. 9-2 at 24-33). Nurse sought review by the Appeals Council, submitted additional evidence, and her request was denied on June 22, 2017, making the ALJ's decision the final decision of the Commissioner. (D.I. 9-2 at 2-5; D.I.

1

9-7 at 67). Nurse filed suit on August 9, 2017 seeking review of the final decision. (D.I. 1).

**B.    Nurse's Testimony**

Nurse, who was 57 years old on the date of the ALJ's decision, has a ninth grade education and can read and write. (D.I. 9-3 at 23). She lives with family members. (*Id*. at 8). She has a driver's license but does not have a car. (*Id*.) She does not prepare dinner but does some household chores such as vacuuming. (*Id*. at 12). She likes to use her computer. (*Id*. at 13-14).

Prior to 2013, Nurse worked in a warehouse as a receiving clerk where she stood on her feet ten to twelve hours a day. (*Id*. 14-15). She has also done some assembly work. (*Id*. at 15). Nurse testified she began working part time on June 17, 2015 stocking shelves in the toy department at Walmart, working between 28 to 32 hours per week, up to eight hours per shift.[1] (*Id*. at 10). She is primarily on her feet and is given a fifteen minute break every two hours in addition to a lunch break. (*Id*. at 11).

Nurse believes she is disabled because she is not the same person she was before she contracted Graves' disease. (*Id*. at 16). She was diagnosed with the condition in 2009. (*Id*.). Nurse testified that because of the Graves' disease she tires easily and is easily fatigued. (*Id*.). Nurse testified that sometimes she is just tired and "just don't really want to go to work." (*Id*. at 24). She estimated that four to five times a month she is so tired that she really cannot leave the house. (*Id*.). She was on medication for the Graves' disease but was taken off because her blood levels were

---

[1] Her part-time employment began subsequent to her alleged onset of disability.

2

dropping too low. (*Id.* at 18). At the time of the hearing she was "kind of maintaining." (*Id.*).

Nurse has headaches every two to three weeks that last four to five days. (*Id.* at 16-17). With headaches she takes pain medication and lies down. (*Id.* at 17). If a headache happens at work she tries to bear it until she gets off work. (*Id.*) The medication she takes for headaches is the same medication she takes for her arthritis. (*Id.*).

In her function report Nurse complained of body pain. (D.I. 9-7 at 33). She described back pain that goes into her shoulders, as well as leg pain. (*Id.* at 41). Nurse testified she has arthritis in her legs and sometimes they "act up." (D.I. 9-3 at 17). Sometimes her legs get very stiff, which makes it difficult for her to walk up and down stairs. (*Id.* at 18). She takes a prescription form of Tylenol for arthritis. (*Id.*). The medication causes side effects including sweating. (*Id.* at 19). It appears the medication causes light sensitivity, because Nurse testified sunlight affects her ability to see. (*Id.*). She also has shortness of breath. (*Id.* at 25).

Nurse testified she weighs 197 pounds and has been diagnosed with diabetes. (*Id.* at 19). The diabetes is being monitored and she is not taking medication for the condition. (*Id.* at 20). Nurse has also been diagnosed with chronic kidney disease. (*Id.*). When asked if she was having problems with it, Nurse replied that it was all right now, but it was supposed to be a lot better than it was. (*Id.*).

Nurse sees both a psychologist and a psychiatrist. (*Id.*). She takes medication for depression. (*Id.* at 21). The medication makes her sweat. (*Id.*). Nurse testified

3

that she has problems with memory and concentration. (*Id.* at 22). When asked if she had problems at work, Nurse replied, "not so much." (*Id.*). Nurse testified that she got along with her coworkers and her supervisors. (*Id.* at 23).

### C. Nurse' Medical and Mental Health History, Condition, and Treatment

Chiropractor Dr. David Cohen provided Nurse regular chiropractic treatment from December 3, 2013 through February 10, 2014 for complaints of headache and neck and back pain. (D.I. 9-8 at 15-24). On December 12, 2013, Dr. Cohen stated that Nurse was unable to work, and at the next visit his notes indicate that treatment had decreased the pain level and improved function. (*Id.* at 16-17). On February 10, 2014, Nurse complained of increased neck, right shoulder, mid back, and low back pain, exacerbated by increased lifting, movement, twisting, pain, spasm, and stiffness proportional to activity, barometric changes, and mental stress. (*Id.* at 21-22). On the same date, Dr. Cohen stated that Nurse was "unable to perform certain activities of daily living." (*Id.*).

On March 10, 2014, Nurse was examined by Daniel Lebowitz, M.D., for a consultative physical examination. (D.I. 9-9 at 2-5). Nurse reported that she lived with a friend and was able to cook, clean, wash laundry, shop, shower, bathe, and dress herself. (*Id.* at 3). She liked to watch television, listen to the radio, read, socialize with friends, go shopping, and use the computer. (*Id.*). Dr. Lebowitz observed that Nurse's gait was tentative, with no limp or use of assistive devices. (*Id.*). She was able to walk on her heels and toes without difficulty, squat fully, and get on and off the examination table and rise from a chair without difficulty. (*Id.*). Nurse's joints were

4

stable and nontender with no evident deformity; her strength was 5/5 in her upper and lower extremities; she had no sensory deficits; her hand and finger dexterity was intact; and her grip strength was 5/5 bilaterally. (*Id.*). Dr. Lebowitz diagnosed Nurse with left arm pain, whole back pain, history of multiple fibroid removals, benign tumor near the right eye, Graves' disease, and high blood pressure, and he gave Nurse a "fair" prognosis. (*Id.* at 5).

A medical source statement completed by Dr. Lebowitz determined that Nurse is able to: lift and carry twenty-one to fifty pounds occasionally, and eleven to twenty pounds continuously. (*Id.* at 6). Dr. Lebowitz based these limitations on Nurse's complaints of pain in her lower back and left arm, while noting her exam was benign. (*Id.*). Dr. Lebowitz determined that Nurse could sit for eight hours; stand for four hours; and walk for two hours at one time without interruption. (*Id.*) He determined that she could sit for eight hours; stand for six hours; and walk for four hours total in an eight-hour day. (*Id.*). Dr. Lebowitz did not find any limitations with regard to Nurse's use of her hands or feet, and he found that she could frequently perform all postural activities, again referring to lower back pain with a benign exam. (*Id.* at 8-9). He determined that Nurse could occasionally be exposed to humidity and wetness but never be exposed to temperature extremes or vibrations. (*Id.* at 10). Contrary to Dr. Cohen's notes from the previous month, Dr. Lebowitz found that Nurse had no limitations with regard to her activities of daily living. (*Id.* at 11).

The 2014 medical records from Nurse's primary care physician Marcia Castro, M.D., refer to Nurse's history of Graves' disease as well as osteoarthritis in her back,

5

legs, and arms with generally normal findings on clinical examinations, including normal gait and reflexes. (D.I. 9-10 at 2). Medical records from 2015 indicate that Nurse had impaired fasting glucose levels and chronic kidney disease. (*Id.* at 9, 12). On March 23, 2015, Nurse underwent a CT scan of her orbits, which showed a borderline Chiari I malformation.[2] (*Id.* at 28).

Endocrinology records from May 2015 reflect that Nurse's thyroid function tests were normal with "as expected" progression. (D.I. 9-11 at 2). Nurse reported no changes in her activity level. (*Id.*). Her endocrinologist reported generally normal findings on physical examination including normal range of motion, strength, gait, and reflexes. (*Id.* at 4). The records noted Nurse's history of Graves' disease, that she was on medication "for at least a year in 2009. Has been off meds since then. TFTs are reasonable. Check TFTs next lab." (*Id.* at 6). When she was seen on June 16, 2015, her gait was within normal limits; her extremities had no cyanosis, clubbing, or edema; and her reflexes were normal and symmetrical. (D.I. 9-10 at 12). At Nurse's September 2015 check-up, she reported that she was doing well with her diet and her examination was essentially normal. (*Id.* at 48, 50).

Records from Nurse's treating nephrologist in 2015 reveal that she presented with normal findings on clinical examinations, including normal ambulation, behavior,

---

[2] Chiari malformation is a condition in which brain tissue extends into the spinal canal. Chiari malformation type I develops as the skull and brain are growing. Signs and symptoms may not occur until late childhood or adulthood. *See* https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last visited Jan. 29, 2019).

and range of motion with no tenderness, swelling, or focal neurological deficits. (*Id.* at 16, 22, 27-28, 34). The records indicate that Nurse has stage III chronic kidney disease with stable renal functioning at baseline. (*Id.* at 25, 31). When Nurse was examined in December 2015, she had improved renal functioning. (*Id.* at 31-36). The December 2015 notes indicate the Graves' disease is stable. (*Id.* at 36).

On April 8, 2014, Dorothy Latella-Zakhireh, Psy.D. conducted a psychological consultative exam. (D.I. 9-9 at 20-24). Nurse provided a history of no psychiatric hospitalization and no prior outpatient treatment services. (*Id.* at 20). She started behavioral health treatment in September 2013 and receives once a month psychiatric treatment and weekly psychological treatment. (*Id.*). Dr. Latella-Zakhireh diagnosed unspecified depressive disorder. (*Id.* at 23). Following the examination, Dr. Latella-Zakhireh opined that the results appeared to be consistent with psychiatric problems, but in itself, did not appear to be significant enough to interfere with Nurse's ability to function on a daily basis. (*Id.* at 23). In addition, Dr. Latella-Zakhireh determined that: (1) Nurse's ability to understand, remember, and carry out instructions was not affected by a mental impairment; (2) Nurse's ability to interact appropriately with supervision, co-workers, and the public, as well as to respond to change in the routine work setting, were not affected by impairments; and (3) there were no other capabilities affected by the impairment. (*Id.* at 17-18).

Mental health treatment records from Wilmington Psychiatric Services from January 19, 2015 through December 9, 2015 indicate that Nurse was seen regularly. (D.I. 9-10 at 34-43, D.I. 9-11 at 8-6). A mental status exam conducted by a social

worker dated December 9, 2015 indicated Nurse was appropriate in appearance, affect, thought content, and behavior. (D.I. 9-11 at 11). She was oriented to person, place time, date and situation. (*Id.*). She had a depressed mood. (*Id.*). She had a logical thought process. (*Id.*). Her speech, judgment, impulse control, and attention were normal. (*Id.*). Her motor skills were slow. (*Id.*). She had average intellect and her insight was present. (*Id.*). She had impaired immediate and recent memory and impaired concentration, but no problem with thought disorder. (*Id.*). The records indicate similar findings each time a mental status exam was conducted.

### D. Vocational Expert's Testimony

A vocational expert ("VE") testified at the administrative hearing. (D.I. 9-3 at 25-29). The ALJ posed a hypothetical to the VE whether an individual like Nurse with similar characteristics, who was limited to medium work that required frequent reaching, handling, fingering, feeling; climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling could perform Nurse's past work as the VE defined it. (*Id.* at 28). The VE testified that the hypothetical individual would be capable of performing Nurse's past relevant work as a store laborer or warehouse worker. (*Id.*).

## II. LEGAL STANDARD

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *see Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)

8

(citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). They should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

### III. REGULATORY FRAMEWORK

Within the meaning of social security law, a "disability" is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. § 404.1505. To qualify for disability insurance benefits, the claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520, § 426.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). The claimant bears the burden of proof at steps one through four, and the

9

Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4), § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), § 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii), § 416.920(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work.[3] *See* 20 C.F.R. § 404.1520(a)(4)(iii), § 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), § 416.920(a)(4)(ii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e), § 416.920(e).

---

[3] Additionally, at steps two and three, the claimant's impairments must meet the twelve month duration requirement. *See* 20 C.F.R. § 404.1520(a)(4)(ii-iii).

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. See 20 C.F.R. § 404.1520(a)(4)(iv), § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. See 20 C.F.R. § 404.1520(a)(4)(v) & (g), § 416.920(a)(4)(v) & (g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, for this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. See *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* This determination requires the ALJ to consider the cumulative effect of the claimant's impairments, and a vocational expert is usually consulted. See *id.*

At step one, the ALJ found that Nurse met the insured status requirements of the Act through September 30, 2014, and she had not engaged in substantial gainful activity since February 24, 2013, the alleged onset date. (D.I. 9-2 at 26). At step two, the ALJ found that Nurse has the following severe impairments: osteoarthritis of the back, legs, and arms; borderline Chiari I malformation; diabetes mellitus; obesity and

11

chronic kidney disease, stage III. (*Id.*). At step three, the ALJ determined that Nurse's impairments did not meet or equal the criteria of any of the impairments in the Listing of Impairments. (*Id.* at 28). The ALJ found that Nurse has

> the residual functional capacity to perform medium work,[4] . . . except that she can perform frequent reaching, handling, fingering, feeling, and climbing of ramps or stairs. In addition, she can never climb ladders, ropes, or scaffolds and can occasionally balance, stoop, kneel, crouch and crawl.

(*Id.*). At step four, the ALJ found that Nurse was able to perform her past relevant work as a store laborer as this work does not require the performance of work-related activities precluded by her RFC. (*Id.* at 32). Therefore, the ALJ determined that Nurse was not under a disability from February 25, 2013 through the date of the March 28, 2016 decision. (*Id.* at 33).

---

[4]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). The Social Security Regulations define sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

## IV. DISCUSSION

Nurse filed her Complaint *pro se*. Therefore, the Court must liberally construe her pleadings, and "apply the applicable law, irrespective of whether she has mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context of a social security appeal).

Nurse states that she read the "court transcript" for her case, and "it's all a lie." (D.I. 12 at 1).[5] She states that she still has headaches, sweats, and feels tired every day. Also, there was no mention of the swelling of her feet, she has pain in her upper and lower back, and some dizziness. She states that the doctors cannot see this because "they are not in [her] body." (*Id.*). Nurse refers to a discrepancy in her education stating she completed the ninth grade, not the eighth grade. (D.I. 15). The Court notes that the ALJ's decision refers to Nurse's ninth grade education. (*See* D.I. 9-2 at 29). Nurse argues that she last had a full time job in January 2010 and after that she was unable to find another job until 2015 when she was hired at Wal-Mart. (D.I. 15). She worked 28 to 32 hours per week at the Walmart job, but as time went by she could not handle the hours and there were times she left her shift early due to not feeling well. (*Id.*).

Nurse contends that when she was examined by Dr. Lebowitz she told him she was in pain, and every task he asked her to do caused her pain. (*Id.*) She states, "I

---

[5] By "court transcript," I understand Nurse to be referring to the ALJ's decision.

13

don't have control of what doctors put in their reports about me. All I know is that I told him I was in pain then and still is. My pain medication was increased, because the pain is too much for me to bear." (*Id.* at 2). Nurse provided a letter that she has been employed by Walmart since June 17, 2015 as a part-time associate with a maximum of twenty to twenty-four hours of work per week. (*Id.* at 4). She also provided a note from First State Medical Associates dated March 27, 2018 indicating her pain medication (acetaminophen) was increased in 2016. (*Id.* at 5).

The Commissioner argues that substantial evidence supports the ALJ's findings that Nurse is not disabled because she remains capable of performing her past relevant work as a store laborer, noting that in deciding Nurse's RFC, the ALJ considered her treatment records, the consultative examination findings, and Nurse's subjective complaints. (D.I. 14).

The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (citing 20 C.F.R § 404.1546(c)). Here, the ALJ considered the effects of Nurse's condition in relation to her ability to perform work. The ALJ found that Nurse has the severe impairments of osteoarthritis of the back, legs, and arms; borderline Chiari I malformation; diabetes mellitus; obesity; and chronic kidney disease, stage III.

The ALJ also considered Nurse's other conditions of hypertension, Graves' disease, and depression, and found them non-severe impairments. The substantial evidence of record supports her finding that these conditions are non-severe impairments. The hypertension is well-controlled with medication. There has been no

change in the Graves' disease since 2009. And, the consultative psychological evaluation and Nurse's treatment records support the ALJ's conclusion that there is no significant mental limitation. The ALJ gave the consultative psychological evaluation significant weight, noting that it was the result of an in-person evaluation. (D.I. 9-2 at 32).

Moreover, it is clear in reading the ALJ's decision that she thoroughly reviewed Nurse's treatment history. In 2014, Nurse's primary care physician reported generally normal findings on clinical examinations, including normal gait and reflexes. In 2015, Nurse's primary care physician reported that Nurse's gait was within normal limits; her extremities had no cyanosis, clubbing, or edema; and her reflexes were normal and symmetrical. In September 2015, Nurse's clinical examination was essentially normal.

Records regarding treatment for kidney disease from 2015 indicate that Nurse presented with normal findings on clinical examinations, including normal ambulation, behavior, and range of motion, with no tenderness, swelling, or focal neurological deficits, and noting she has stage III chronic kidney disease with stable renal functioning at baseline. Her December 2015 records indicate improved renal functioning. In addition, 2015 endocrinology records reflect normal thyroid function tests with as expected progression and no reported changes in Nurse's activity level.

In assessing Nurse's physical residual functional capacity, the ALJ afforded significant weight to the opinion of consultative examiner Dr. Lebowitz, noting he too had conducted an in-person examination of Nurse. (D.I. 9-2 at 21). The ALJ noted the fairly unremarkable findings reported by Dr. Lebowitz at the consultative physical

15

examination and noted that, in contrast to Nurse's description of her symptoms, Dr. Lebowitz reported that while Nurse's gait was tentative, she did not limp or use an assistive device; she was able to walk on her heels and toes without difficulty, squat fully, and get on and off of the examination table and rise from a chair without difficulty; her joints were stable and non-tender with no evident deformity; her strength was 5/5 in her upper and lower extremities; she had no sensory deficits; her hand and finger dexterity was intact; and her grip strength was 5/5 bilaterally. Moreover, Dr. Lebowitz's conclusions of Nurse's ability to perform work related activities were consistent with the ALJ's RFC finding.

The ALJ noted that the RFC assessment is supported by the treatment records that documented generally normal findings on clinical examinations with minimal treatment including medication and chiropractic adjustments. The ALJ also noted that Nurse had minimal functional limitations, a finding for which there is substantial evidence of record.

Finally, the ALJ considered Nurse's subjective complaints of pain and reasonably determined that they were inconsistent with the record evidence. The RFC assessment is supported by Nurse's statements regarding her high level of regular activities despite her impairments, including her ability to return to work on at least a part-time basis.

The substantial evidence of record supports the ALJ's residual functional capacity assessment that Nurse is capable of performing medium work except that she can perform frequent reaching, handling, fingering, feeling, and climbing of ramps or

stairs and with the limiting factors that she can never climb ladders, ropes, or scaffolds and can occasionally balance, stoop, kneel, crouch, and crawl. The ALJ thoroughly analyzed the medical evidence, considered the medical opinions, and appropriately relied upon the testimony of the VE in concluding that Nurse is capable of performing her past relevant work as a store laborer. Accordingly, the Court finds that substantial evidence supports the ALJ's ruling and her evaluation of Nurse's residual functional capacity.

## V. CONCLUSION

For the reasons discussed above, the Court will: (1) deny Nurse's motion for summary judgment (D.I. 12); and (2) grant the Commissioner's cross-motion for summary judgment (D.I. 13).

A separate order will be entered.